## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| AKUMIN INC., *et al.*,[1] | Case No. 23-90827 (CML) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF RIADH ZINE IN SUPPORT OF FIRST DAY MOTIONS

I, Riadh Zine, pursuant to section 1746 of title 27 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chairman of the board of directors ("Board") and Chief Executive Officer ("CEO") of debtor Akumin Inc., a company incorporated under the laws of Delaware ("Akumin Inc.," together with its debtor affiliates, collectively, the "Debtors" or "Akumin". The Debtors, together with its non-Debtor affiliates, will be referred to herein as the "Company"). I have served as CEO since 2014.  Prior to my time at Akumin, I served as a Managing Director at a global investment bank, providing strategic advice and executing equity and debt financings as well as M&A transactions to large corporations and private equity firms across various industries. I began my career at one of the largest global banks where I worked on several strategic projects.  I hold a Master of Science (MSc) from the University of Montreal.

2.      As CEO of Akumin, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Akumin.  The Debtors' service address is 8300 W. Sunrise Boulevard, Plantation, Florida 33322.

circumstances leading to the commencement of these chapter 11 cases. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions (as defined below) filed contemporaneously herewith. I am authorized to submit this Declaration on behalf of the Debtors.

3.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' advisors. If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

4.     This Declaration is organized in five sections:

- Part I provides an overview of the transaction;

- Part II provides background information on Akumin's corporate history and operations;

- Part III offers an overview of Akumin's prepetition corporate and capital structure;

- Part IV describes the financial and operational circumstances leading to the need for the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts; and

- Part V summarizes the relief requested in the First Day Motions.

**I.     Overview**

5.     Akumin is a leading national provider of outpatient radiology and oncology solutions to hospitals, health systems, and physician groups. The Debtors provide fixed-site

2

outpatient diagnostic imaging services through a network of approximately 180 owned and operated imaging locations as well as outpatient radiology and oncology services and solutions to approximately 1,000 hospitals and health systems across 48 states. Akumin's imaging procedures include magnetic resonance imaging (MRI), computed tomography (CT), positron emission tomography (PET and PET/CT), ultrasound, diagnostic radiology (X-ray), mammography and other related procedures. The Debtors' cancer care services include radiation therapy and related offerings.

6.      Since the commencement of the COVID-19 pandemic, Akumin has faced a series of both systemic and unique challenges that resulted in a substantial increase in the cost of doing business. Although the Debtors are confident that future quarters will yield sustained demand for the services that the Debtors offer, the culmination of negative headwinds and the Debtors' existing balance sheet made it clear that a restructuring transaction that allowed for a substantial deleveraging of their debt structure was imminently necessary. Accordingly, in mid-July 2023, the Debtors embarked on a months' long process to review strategic alternatives and engage with major stakeholders in a constructive and arm's length dialogue.

7.      To address these challenges, the Debtors negotiated a holistic balance sheet restructuring and recapitalization memorialized in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Akumin Inc. and its Debtor Affiliates* (the "Prepackaged Plan")[2] filed concurrently with this Declaration. The Prepackaged Plan eliminates over $450 million in funded debt, extends maturity profiles of certain remaining funded debt by two years, and provides a $130 million new money investment in the Company. It has the overwhelming support of the Debtors' major stakeholders, as evidenced by the restructuring support agreement

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Prepackaged Plan or applicable First Day Motion.

(the "RSA") that the Debtors' entered into prior to the Petition Date.  The parties to the RSA include, among others, (i) noteholders holding approximately 69.6% of the outstanding principal amount of the secured notes due in 2025, (ii) noteholders holding approximately 79.9% of the outstanding principal amount of the secured notes due in 2028, (iii) 100% of the lenders to the Debtors' revolving credit facility, (iv) Stonepeak Magnet Holdings LP ("Stonepeak" or the "Consenting Sponsor"), as the holder of 100% of the Series A unsecured notes, and (v) shareholders holding approximately 34.2% of Akumin Inc.'s common equity.

8.      Through the largely consensual Prepackaged Plan, the Debtors expect to emerge from chapter 11 expeditiously with a stronger balance sheet, new capital, and an increased ability to continue to provide high quality services to hospitals, health systems, and physician groups throughout the country.

### A. Transaction Overview

9.      The parties to the RSA have agreed to vote in favor and support confirmation of the Debtors' Prepackaged Plan.  As a result of the RSA, and the support of the creditors, shareholders, and other parties thereto, each impaired class of creditors under the Prepackaged Plan entitled to vote on the Prepackaged Plan will vote to accept the Prepackaged Plan.

10.      The Prepackaged Plan contemplates a fulsome recapitalization transaction that will allow for substantial deleveraging and new capital infusion to right size the Debtors' balance sheet for the benefit of all stakeholders (a "Reorganization Transaction").

11.      In the event of a Reorganization Transaction, the Debtors will emerge with approximately $790 million[3] debt while keeping general unsecured claims unimpaired. The following table summarily illustrates the difference between the Debtors' capital structure as of

---

[3] Such amount assumes a reduction at emergence of $60 million on account of the Reverse Dutch Election Opportunity (as defined and in the Prepackaged Plan and described below).

the Petition Date compared to the capital structure contemplated by the Prepackaged Plan upon emergence from chapter 11:

| Current Funded Debt | | Reorganized Funded Debt | |
|---|---|---|---|
| Prepetition RCF Facility | $55 million | New RCF Exit Facility ($55 mm) | - |
| Prepetition 2025 Notes | $475 million | New 2027 Notes | $475 million |
| Prepetition 2028 Notes | $375 million | New 2028 Notes | $375 million |
| Prepetition Series A Note | $470 million | Less Amounts Funded to Reverse Dutch Election Opportunity | ($60 million) |
| **Total Current Funded Debt** | **$1.375 billion** | **Total Reorganized Funded Debt** | **$790 million** |

12.     As mentioned above, the Prepackaged Plan provides for sufficient commitments of capital to fund distributions under the Prepackaged Plan and the Debtors' go-forward operations post-emergence.  The Prepackaged Plan includes commitments for a $130 million cash infusion by the Consenting Sponsor.  This cash infusion will include a commitment to provide (a) a $75 million junior secured debtor-in-possession facility on a non-priming basis to pay down in full the Debtors' Prepetition RCF Facility (as defined below), (b) $60 million for the Reverse Dutch Election Opportunity,[4] and (c) additional liquidity during these bankruptcy cases.  Claims on account of this DIP Loan (as defined below) will convert into common stock of the reorganized business upon the effective date and therefore it will not impact the deleveraging accomplished by the Prepackaged Plan.  The shareholders of Akumin will also receive their pro rata share of $25 million in cash and contingent value rights (or the value thereof) as is more fully described in the Prepackaged Plan and Disclosure Statement (as defined below).

13.     The Debtors' general unsecured creditors, such as trade vendors, employees, strategic partners, including all hospitals, health networks, and physician groups, will be satisfied in the ordinary course of business, subject to the applicable contracts governing their relationships with the Debtors.  Trade contracts and terms will be maintained and customer relationships will remain intact.  Operations will continue in the ordinary course.  In short, the

Prepackaged Plan will allow the Debtors to reduce their debt to a sustainable level and will permit the Debtors to restructure as a viable enterprise, well-positioned for success.

14.     I believe that the transactions contemplated to be effectuated by the Prepackaged Plan represent the best solution to the financial challenges Akumin faces and will benefit Akumin's employees, customers, vendors, creditors and shareholders.

**B. Proposed Timeline**

15.     Prior to the Petition Date, the Debtors commenced the solicitation of votes on the Prepackaged Plan through the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Akumin Inc. and its Debtor Affiliates* (the "Disclosure Statement"). Consistent with their obligations under the RSA, the Debtors are seeking to emerge from chapter 11 on an expedited basis.

16.     The following table highlights the Debtors' proposed key dates for these chapter 11 cases:

| Proposed Confirmation Schedule | |
|---|---|
| Voting Record Date | October 20, 2023 |
| Prepetition Solicitation Commencement Date | October 21, 2023 |
| Mailing of Combined Hearing Notice | Within one (1) business days following entry of the Order, or as soon as reasonably practicable thereafter |
| Plan Supplement Filing Deadline | November 15, 2023 |
| Voting Deadline | 5:00 p.m. (prevailing Central Time) on November 15, 2023 |
| Proposed Objection Deadline | 5:00 p.m. (prevailing Central Time) on November 22, 2023 |
| Proposed Reply Deadline | November 27, 2023 |

---

[4] The Reverse Dutch Election Opportunity will provide certain holders of Prepetition 2025 Notes and Prepetition 2028 Notes with the opportunity to obtain cash in lieu of receiving the New 2027 Notes and New 2028 Notes (as defined in the Prepackaged Plan), as applicable, in the aggregate amount of up to $60 million.

| Proposed Confirmation Schedule | |
|---|---|
| Combined Hearing | November 29, 2023 |

## II.  Akumin's History and Operations

### A.  Akumin's Business and Operations

17.     Founded in late 2014, Akumin is a premier nationwide provider of outpatient radiology and oncology services, whose mission is to elevate the patient experience at every stage of their healthcare journey.  Today, Akumin is a national provider of healthcare services and employs over 3,500 employees across the country.

18.     From its earliest beginnings, Akumin has been focused on helping today's modern healthcare consumers become more active participants in managing their health.  Akumin's multi-modality imaging offering provides a one-stop-shop for patients and referring physicians.

19.     Akumin provides fixed-site outpatient diagnostic imaging services through a network of approximately 180 owned and/or operated imaging locations; and outpatient radiology and oncology services and solutions to approximately 1,100 hospitals and health systems across 48 states. Akumin's imaging procedures include magnetic resonance imaging (MRI), computed tomography (CT), positron emission tomography (PET and PET/CT), ultrasound, diagnostic radiology (X-ray), mammography, and other related procedures. Akumin's cancer care services include a full suite of radiation therapy and related offerings.

20.     Akumin's multi-modality imaging offering provides a one-stop-shop for patients and referring physicians and diversifies Akumin's revenue sources.  Akumin is significantly diversified across business lines, geographies, modality offerings and reimbursement sources. The diversity of Akumin's business provides a number of advantages, including having no

material revenue concentration with any health system or hospital customer and no material concentration with any commercial payor.

21.     Akumin's revenues consist primarily of net patient fees received from various payors and patients based on established contractual billing rates, less allowances for contractual adjustments and implicit price concessions. Revenues are also derived directly from hospitals and healthcare providers.  In recent years, Akumin's revenue has been impacted by inflationary pressures, particularly labor, fuel, and medical supplies.  Akumin's suppliers and third-party service providers pass along rising costs in the form of higher prices.

22.     The market for outpatient diagnostic imaging and oncology services is highly competitive. Akumin competes principally on the basis of its reputation, the ability to provide multiple modalities at centers across the country, and the quality of Akumin's outpatient diagnostic imaging and oncology services. Akumin competes locally with groups of individual healthcare providers, established hospitals, clinics and other independent organizations that own and operate imaging and radiation therapy equipment.  Akumin's revenue has also been impacted by changes to U.S. healthcare laws, partners' and contractors' healthcare costs, and reimbursement rates by payors.

**B.  The Alliance Acquisition**

23.     On September 1, 2021, Akumin acquired all of the issued and outstanding common stock of Thaihot Investment Company US Limited, which owned 100% of the common stock of Alliance Healthcare Services, Inc. ("Alliance"), from Thaihot Investment Co., Ltd. (the "Alliance Seller") for a total purchase price of $785.6 million (the "Alliance Acquisition"). The Alliance Acquisition included Alliance's ownership interests in its wholly-owned subsidiaries and joint ventures. The Alliance Acquisition was financed with (i) cash on hand, (ii) $340.0 million of proceeds from the issuance of Series A Stonepeak Note (as defined below), (iii) $10.4

million of proceeds from the issuance of 3,500,000 shares of Akumin's common stock to Stonepeak, (iv) $375.0 million of proceeds from a private offering of Prepetition 2028 Notes, and (v) the issuance of 14,223,570 shares of Akumin's common stock to the Alliance Seller. The Alliance Acquisition enabled Akumin to expand its services and business into areas of the United States in which it previously did not have operations.

## III.   Akumin's Prepetition Corporate and Capital Structure

### A. Akumin's Corporate Structure

24.     As set forth on the organizational chart attached hereto as **Exhibit A**, Akumin Inc. wholly owns, directly or indirectly, each of the Debtors. Each of the Debtors is an obligor of one or more of Akumin Inc.'s debt facilities by way of being a borrower or guarantor.

25.     Eight physician-owned and non-debtor entities have also guaranteed certain of the Debtors' funded debt obligations (the "Physician-Owned Entities").  The Debtors have entered into management services agreements with each of the Physician-Owned Entities and do not own any of the equity interests of the Physician-Owned Entities.  The Physician-Owned Entities have not commenced chapter 11 cases.

26.     Fourteen affiliates of the Debtors that are parties to certain joint venture agreements with third parties, including hospitals and other health care providers, have also guaranteed certain of the Debtors' funded debt obligations (the "JV Entities"). In order to avoid any direct or indirect impact on the JV Entities' respective joint ventures, the JV Entities have not commenced chapter 11 cases. [5]

---

[5] If the Prepackaged Plan is consummated, the Physician-Owned Entities and the JV Entities have each agreed pursuant to the RSA to provide new guarantees of the New Notes and New RCF Facility in exchange for a release of the prepetition guarantees of the funded debt under the Prepackaged Plan.

### B. Equity Ownership

27.     The Debtors are wholly-owned by Akumin Inc., which is a Delaware corporation with shares publicly listed on the NASDAQ Stock Market (NASDAQ) and Toronto Stock Exchange (TSX).

28.     As of October 19, 2023, 300,000,000 shares of Akumin Inc.'s common stock had been authorized with 91,173,491 shares of common stock issued and outstanding.  On April 19, 2023, Akumin received a notice from the NASDAQ staff (the "Staff") that Akumin was not in compliance with applicable listing rules.  On August 15, 2023, the Staff sent a subsequent notice identifying an additional listing rule deficiency applicable to Akumin.  On October 17, 2023, Akumin received a further notice that its common stock was scheduled for delisting from the NASDAQ and will become suspended at the opening of business on October 26, 2023, subject to Akumin's applicable rights to appeal the Staff's determination.

### C. Prepetition Funded Debt

29.     As of the Petition Date, Akumin has approximately $1.375 billion in total funded debt obligations.  The relative amounts and priorities of each debt obligation set forth herein are as follows:

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| **Prepetition RCF Facility** | November 2, 2025 | $55 million |
| **Prepetition 2025 Notes** | November 1, 2025 | $475 million |
| **Prepetition 2028 Notes** | August 1, 2028 | $375 million |
| **Prepetition Series A Notes** | September 1, 2033 | $470 million |
| | **Total Funded Debt** | $1.375 billion |

### 1. Prepetition RCF Facility

30.     Akumin Inc. is a party to that certain Revolving Credit Agreement, dated as of November 2, 2020, as amended by that certain Amendment No. 1, dated as of February 8, 2021, Amendment No. 2, dated as of July 26, 2021, Amendment No. 3 & Waiver, dated as of

September 11, 2021 and Amendment No. 4 & Waiver, dated as of October 22, 2021 (as has been and may be further amended, supplemented, or otherwise modified from time to time, the "Revolving Credit Agreement"), by and among Akumin Inc., as borrower, certain subsidiaries of Akumin Inc. as guarantors (the "Guarantors"), PNC Bank, National Association, as successor to BBVA USA, as administrative agent and collateral agent (the "Prepetition RCF Agent"), and the lenders from time to time party thereto, which is comprised of a revolving credit facility in an aggregate principal amount of $55 million, with sub-limits for the issuance of letters of credit and for swingline loans (the "Prepetition RCF Facility"). Obligations arising under the Prepetition RCF Facility are secured by substantially all of the assets of the Debtors *pari passu* with the security granted in connection with the Prepetition 2025 Notes (as defined below) and the Prepetition 2028 Notes (as defined below), subject to customary exceptions and exclusions. The Prepetition RCF Facility matures on November 2, 2025, provided that, if more than $50 million in aggregate principal amount of the Prepetition 2025 Notes is outstanding on May 5, 2025, then the maturity date for the Prepetition RCF Facility shall instead be May 5, 2025.

### 2. Prepetition 2025 Notes

31.     Akumin Inc. entered into that certain Indenture dated November 2, 2020, as supplemented by that certain First Supplemental Indenture, dated as of February 11, 2021, Second Supplemental Indenture, dated as of July 30, 2021, and Third Supplemental Indenture, dated as of September 1, 2021, (as may be further amended, restated, supplemented, or otherwise modified from time to time), by and among Akumin Inc., as issuer, the Guarantors, as guarantors, and UMB Bank, National Association, as trustee and collateral agent in respect of the issuance of $475 million of aggregate principal amount of notes (the "Prepetition 2025 Notes"). The Prepetition 2025 Notes are secured by substantially all of the assets of the Debtors *pari passu* with the security granted in connection with the Prepetition RCF Facility and the

11

Prepetition 2028 Notes, subject to customary exceptions and exclusions. The Prepetition 2025 Note bear interest at a rate of 7.000% per annum, payable on May 1 and November 1 of each year, and mature on November 1, 2025.

### 3. Prepetition 2028 Notes

32.    Akumin Inc. entered into that certain Indenture dated August 9, 2021, as supplemented by that certain First Supplemental Indenture, dated as of September 1, 2021 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Akumin Escrow Inc. (whose obligations were assumed by Akumin Inc. on closing of the acquisition of Alliance Healthcare Service on September 1, 2021), as issuer, the Guarantors, as guarantors, and UMB Bank, National Association, as trustee and collateral agent  in respect of the issuance of $375 million of aggregate principal amount of notes (the "Prepetition 2028 Notes"). The Prepetition 2028 Notes are secured by substantially all of the assets of the Debtors *pari passu* with the security granted in connection with the Prepetition RCF Facility and the Prepetition 2025 Notes, subject to customary exceptions and exclusions. The Prepetition 2028 Notes bear interest at a rate of 7.500% per annum, payable on February 1 and August 1 of each year, and mature on August 1, 2028.

### 4. Prepetition Series A Note

33.    Akumin Operating Corp., a wholly owned subsidiary of Akumin Inc., issued an unsecured PIK toggle series A note dated September 1, 2021 (the "Stonepeak Note") to Stonepeak in the initial principal amount of $340 million. Until September 1, 2024, provided certain conditions are met, Akumin Operating Corp. will be permitted to draw up to an additional $335.57 million from Stonepeak. Akumin Operating Corp. had the right under the Stonepeak Note, and elected, to pay interest in-kind until September 1, 2023 at a rate of 13% per annum, as

opposed to cash interest at 11% per annum.  Accordingly, the balance of the Stonepeak Note increased to $470 million.

34.     Akumin Inc. and Stonepeak have entered into several agreements to defer the payment of cash interest under the Stonepeak Note for the interest period ended September 29, 2023.  The initial agreement deferred the payment until October 16, 2023, but due in part to the Cyber Security Breach described below, the deferral was ultimately extended to October 23, 2023.

### D.  Equipment Debt, Trade Payables, and Ordinary Course Obligations

35.     In addition to the Company's funded debt obligations, as of the Petition Date, the Company owes an estimated $87.3 million of equipment debt and $66 million to third-party suppliers, vendors, and other ordinary course unsecured creditors.  The Prepackaged Plan provides that all such creditors will be unimpaired and paid in the ordinary course of business.

## IV.  Events Leading to These Chapter 11 Cases

### A.  COVID-19 and Increased Operational Cost

36.     Beginning in 2020, the negative impact and systemic strain that the COVID-19 pandemic placed on the healthcare industry cannot be understated and the impact on Akumin was similarly unprecedented.  Less urgent services were cancelled or postponed while healthcare professionals and hospitals operated at their limits to deal with the crisis.  The COVID-19 pandemic significantly impacted Akumin's revenues and costs.

37.     Since late 2021, labor shortages among healthcare providers resulting from the COVID-19 pandemic led to increased difficulty in hiring and retaining staff as well as increased labor costs. The shortage of clinical labor also impacted Akumin's ability to expand and increase revenue in existing locations.  During this period, certain customers also suffered financial challenges, causing revenue to decrease. Equipment delays and increased inflation also impacted

the cost of Akumin's medical supplies and other expenses, causing the costs of operation to increase significantly. Finally, lingering supply chain issues contributed to equipment delays.

**B. Prepetition Restructuring Efforts**

38.    In the midst of market headwinds and the Debtors' need to deleverage their balance sheet, the Debtors shifted their strategic focus to achieve a comprehensive restructuring transaction. Commencing in 2023, Akumin conducted discussions with noteholders of the Prepetition 2025 Notes and Prepetition 2028 Notes, and Stonepeak relating to potential changes and solutions to Akumin's debt structure.

39.    On July 7, 2023, Akumin received an exploratory non-binding letter from Stonepeak with potential terms for a transaction that included a restructuring of the Prepetition 2025 Notes and Prepetition 2028 Notes as a closing condition to such a transaction (the "Stonepeak Letter").

40.    On July 10, 2023 the Board discussed the Stonepeak Letter and established a special committee of independent directors (the "Special Committee"). The Special Committee was charged with leading the negotiations and exploring the transaction contemplated by the Stonepeak Letter as a means to address the Debtors' balance sheet. The Special Committee's members did not include myself, anyone from management, or Stonepeak's Board designee. The Special Committee has guided the Debtors through the prepetition restructuring process and overseen all aspects of the negotiation.

41.    The Special Committee hired independent legal counsel Dorsey & Whitney LLP and financial advisors, Leerink Partners ("Leerink"), and with the aid of the company's other professionals, to work together with the Special Committee to manage the restructuring process. Through July 2023 and early August 2023, Stonepeak and the Special Committee and their advisors continued negotiations over the terms of a potential transaction.

42.     After months of arms-length negotiation between and among the Debtors (overseen by the Special Committee), Stonepeak, and noteholders, the Debtors entered into the RSA.  Pursuant to the RSA, the Consenting Stakeholders have agreed to, among other things:

- subject to receipt of the Disclosure Statement, vote to accept the Prepackaged Plan;

- grant and not opt-out of the releases contemplated by the Prepackaged Plan;

- refrain from taking any action that would delay or impede consummation of the Prepackaged Plan; and

- support and effectuate the documentation within the timeframes contemplated by the RSA.

43.     Together, the RSA and the Prepackaged Plan provide a pathway toward a comprehensive restructuring of the Debtors' prepetition obligations, preserve and strengthen the going-concern value of the business, maximize creditor recoveries, and provide for an equitable distribution to the Debtors' stakeholders, all while minimizing disruption to day-to-day operations.

## C.  Prepetition Marketing Process

44.     Although the Debtors, led by the Special Committee, continued to pursue the negotiations and discussions related to the RSA and Prepackaged Plan, the Special Committee directed the Debtors' advisors in July 2023 to embark on a marketing process (the "Marketing Process") so as to determine if the proposed transaction offered by Stonepeak is the best value maximizing alternative for stakeholders.

45.     Akumin, with the assistance of Leerink (who was engaged in part because of its deep expertise in the healthcare space), began the Marketing Process on or about July 18, 2023. In connection with the Marketing Process, Leerink contacted potential transaction partners/buyers to explore the possibility of an alternative value maximizing sale transaction.  To

date, the Marketing Process has not resulted in any actionable bids or offers to purchase or engage in a sale transaction.

46.    The Debtors negotiated for an extension and continuation of the Marketing Process in the RSA during the Debtors' chapter 11 cases in order to ensure the transactions contemplated by the RSA provide the best result for stakeholders.  Indeed, the Debtors intend to use the postpetition period to actively attempt to develop an alternative transaction that will provide superior value to the RSA and Prepackaged Plan.  Accordingly, the RSA expressly includes the right of the Debtors to continue the Marketing Process and the Prepackaged Plan provides for a "pivot" to an alternative transaction if there is an offer that provides greater value to all stakeholders than what is proposed in the RSA.  As described in more detail in the Bidding Procedures Motion (as defined herein), the Debtors are seeking authority to continue the Marketing Process postpetition and establish certain bid deadlines and requirements.

47.    Whether a sale transaction or the Reorganization Transaction occurs, the ultimate result from consummation of the Prepackaged Plan will be a substantial deleveraging that will permit the Debtors to move forward with greater ability to use cash to support growth and operations, rather than debt service – a result that will inure to the benefit of all stakeholders.

### D.  The Cyber-Security Breach

48.    On October 11, 2023, the Debtors identified suspicious activity in their information technology network, which is the result of a ransomware incident (the "Cyber-Security Breach").  Upon becoming aware, the Debtors took quick action to secure their networks, including shutting down systems. The Debtors also launched an investigation, engaged experienced cybersecurity counsel, which is working with cybersecurity advisors, and notified law enforcement. The Debtors have begun notifying impacted business partners, and will continue to notify potentially affected third-parties and individuals in accordance with legal

obligations.  The Cyber-Security Breach disrupted the Debtors' ability to provide services to their business partners since October 11, 2023.  The Cash Management System (as described below) was also impacted by the Cyber-Security Breach.  The Debtors are working with their business partners and third-party specialists to safely resume business activities.  The Debtors resumed treating some patients on October 13, 2023.  Based on the investigation to date, it appears likely that the attacker accessed files containing personal data, including Protected Health Information ("PHI") (as defined by the Health Insurance Portability and Accountability Act ("HIPAA")).  The ongoing investigation is expected to lead to further information regarding the impact of the Cyber-Security Breach on the Company's operations, the cost of remediation and other potential liabilities.  The Company carries cyber/privacy liability insurance to protect it against certain losses related to incidents of this nature.  However, the Company may have incurred, and may incur in the future, expenses and losses related to the Cyber-Security Breach that are not covered by insurance.

49.     The Cyber-Security Breach has placed additional financial pressures on the Debtors as they were required to cease operations until they were able to safely regain access to the Debtors' systems.

## V.     Evidentiary Support for First Day Motions

50.     Contemporaneously herewith, the debtors have filed a number of motions seeking emergency relief (together, the "First Day Motions") intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring.  I have reviewed each of the First Day Motions and believe that the factual support set forth in each of the First Day Motions is correct and accurate to the best of my

knowledge, information, and belief.  A description of the relief requested and the facts

supporting each of the First Day Motions follows.[6]

### A. Administrative and Procedural Motions

**1. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

51.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order

directing joint administration of the chapter 11 cases.  Because of the Debtors' affiliation with

one another, and in light of the provisions of the Bankruptcy Rules and the Bankruptcy Local

Rules, joint administration of the chapter 11 cases is warranted and would provide significant

administrative convenience without harming the substantive rights of any party in interest.  Joint

administration would avoid the preparation, replication, service, and filing, as applicable, of

duplicative notices, applications, and orders, thereby saving the Debtors considerable expense

and resources.  The Debtors' financial affairs and business operations are closely related. Many

of the motions, hearings, and orders in the chapter 11 cases will affect each Debtor and its

respective estate.  The rights of creditors would not be adversely affected, as this Motion

requests only administrative, and not substantive, consolidation of the estates.  Each creditor

shall still file its claim against a particular estate (to the extent claims must be filed).  In fact, all

creditors would benefit by the reduced costs that would result from the joint administration of the

chapter 11 cases.  The Court also would be relieved of the burden of entering duplicative orders

and maintaining duplicative files.  Finally, supervision of the administrative aspects of the

chapter 11 cases by the Office of the United States Trustee for the Southern District of Texas

(the "<u>U.S. Trustee</u>") would be simplified.

---

[6] Terms not defined in Section V of this Declaration have the meaning set forth in the respective First Day Motion.

52.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Joint Administration Motion should be approved.

> **2.    Debtors' <u>Emergency</u> Motion For Entry of an Order (I) Authorizing the Debtors to Redact Certain Personal Identifying Information; (II) Waiving the Requirement to File a List of Equity Security Holders; and (III) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

53.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an Order (a) waiving the requirement to file a list of equity security holders, (b) authorizing the Debtors to redact personal identifying information from documents filed with the Court in these chapter 11 cases (including any Creditor Matrix), schedule, or statement, and (c) granting related relief.

54.     ***The Equity Security Holders.*** Akumin Inc.'s common stock is publicly-traded on NASDAQ and the Toronto Stock Exchange, with approximately 91 million outstanding shares of common stock as of the Petition Date, and cannot be readily traced to specific individual holders. Akumin Inc. only maintains a list of its registered equity security holders and therefore must obtain the names and addresses of its beneficial shareholders from a securities agent.  Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties would create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest.

55.     Akumin Inc. has taken or will take several actions to inform its equity security holders of the commencement of these chapter 11 cases.  With its petition, Akumin Inc. filed a list of persons and entities with significant holdings of its outstanding common stock.  On or about the date hereof, the Debtors will issue a press release announcing the filing.  As soon as is practicable following the date hereof, the Debtors intend to cause the notices required under

Bankruptcy Rule 2002(d) to be served on registered holders of Akumin Inc.'s common stock and published in full in *The New York Times* (National Edition) and USA Today (National Edition)[7] or similar publication in the Debtors' business judgment.  Accordingly, the Debtors submit that the waiver of the requirement for the Debtors to file a list of equity security holders is appropriate.

56.     ***The Personal Identifying Information.***  The Debtors respectfully seek entry of an order authorizing the redaction of personal identifying information from any document filed or to be filed with the Court in these chapter 11 cases, so as to protect individuals and to prevent the Debtors from potentially violating applicable data privacy and protection laws or regulations.

57.     In this case, cause exists under section 107(c) to redact the personally identifying information of individuals, including individuals who are patients, employees, directors, officers, or individual equity holders of the Debtors, because such information could be used to perpetuate identity theft or create other risks to the individuals' safety and welfare.  The Debtors propose to provide an unredacted version of the consolidated creditor matrix, the schedules of assets and liabilities and the statement of financial affairs (if applicable) to the Court, the U.S. Trustee, and to any official committee of unsecured creditors appointed in these chapter 11 cases.  The Debtors believe such procedures would be fair, would not impair the rights of any parties, and are within the bounds of this Court's prior decisions.

58.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

---

[7] *See Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling a Combined Disclosure Statement Final Approval and Plan Confirmation Hearing and Setting Related Deadlines, (III) Approving (A) the Solicitation Procedures and (B) the Confirmation Hearing Notice, (IV) Approving (A) the Reverse Dutch Election Procedures and (B) Reverse Dutch Election Forms, (V) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules, SOFAs, and 2015.3 Reports, (VI) Establishing Procedures for the Assumption and Rejection of Executory Contracts and Unexpired Leases and (VII) Granting Related Relief.*

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Creditor Matrix Motion should be approved.

     **3.**    **Debtors' <u>Emergency</u> Motion For Entry of An Order (I) Authorizing the Implementation of Procedures to Protect Confidential Patient Information and (II) Granting Related Relief (the "<u>Patient Privacy Motion</u>").**

59.     Pursuant to the Patient Privacy Motion, the Debtors seek an order authorizing certain procedures to protect the confidential information of current and former patients in the Debtors' network who have used the Debtors' services, the Debtors' employees, or the Debtors' affiliated medical groups to whom the Debtors provide services.

60.     Specifically, the Debtors request that the Claims Agent be allowed to prepare pursuant to section 521(a)(1)(A) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(1), a separate creditor matrix of the patients and, pursuant to section 521(a)(1)(B)(i) of the Bankruptcy Code and Bankruptcy Rule 1007(b)(1)(A), separate schedules of claims that may be asserted by and against the Patients (the "<u>Patient Schedules</u>").

61.     The Debtors request that the Claims Agent not be required to file the Patient Matrix or the Patient Schedules with this Court but, instead, that the Claims Agent be allowed to file a redacted version of the Patient Schedules that redacts the Patients' PHI, such as the names, addresses, and any unique identifying numbers (except those assigned to code the data) of the Patients.

62.     To the extent any paper filed or to be filed with the Court in these chapter 11 cases, including the Schedules and Statements (if applicable), includes Patients' PHI, the Debtors request to be authorized to redact the Patients' PHI from such filing; *provided, however*, that the Patient Matrix and the Patient Schedules, and any other papers filed in these chapter 11 cases from which the Debtors have redacted the Patients' PHI may be reviewed by (a) this Court, (b) the U.S. Trustee, (c) any applicable state regulatory agency (through the respective state

attorney general), and (d) any other party in interest that obtains, after notice and a hearing, authorization from this Court.

63.     The Debtors also seek relief to continue their storage and maintenance of Patient records in the ordinary course, including to transfer or pay a third-party provider to maintain certain such records in the case of facility or office closure and pursuant to all applicable federal or state laws and regulations.

64.     I believe that the relief requested in the Patient Privacy Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Patient Privacy Motion should be approved.

### 4. Debtors' *Ex Parte* Application For Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent (the "<u>Epiq Retention Application</u>").

65.     Pursuant to the Epiq Retention Application, the Debtors seek entry of an order (a) appointing Epiq Corporate Restructuring, LLC ("<u>Epiq</u>") as claims, noticing, and solicitation agent in the Debtors' chapter 11 cases, to, among other tasks, serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest, provide computerized claims, objection, solicitation, and balloting database services, provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement; and (b) granting related relief.  In support of the Epiq Retention Application, the Debtors submit the Declaration of Katie Mailloux, a Senior Director of Epiq, attached to the Epiq Retention Application as <u>Exhibit B</u>.  The Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Epiq's rates are competitive and reasonable given Epiq's quality of services and

expertise. The terms of Epiq's retention are set forth in the Engagement Agreement attached to the Epiq Retention Application as Exhibit A.

66.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the Claims, Noticing, and Solicitation Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

67.     The Debtors are seeking a waiver of the requirement to file their schedules of assets and liabilities.  However, if the Debtors are required to do so, they anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

68.     I believe that the relief requested in the Epiq Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Epiq Retention Application should be approved.

**5. Debtors' <u>Emergency</u> Motion For Entry of an Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling a Combined Disclosure Statement Final Approval and Plan Confirmation Hearing and Setting Related Deadlines, (III) Approving (A) The Solicitation Procedures and (B) The Confirmation Hearing Notice, (IV) Waiving the Requirements That the U.S. Trustee Convene a Meeting of Creditors and The Debtors File Schedules and SOFAs, (V) Establishing Procedures For the Assumption and Rejection of Executory Contracts and Unexpired Leases and (VI) Granting Related Relief (the "<u>Scheduling Motion</u>").**

69.     Pursuant to the Scheduling Motion, the Debtors request entry of an order (a) conditionally approving the Disclosure Statement, (b) scheduling the combined hearing on confirmation of the Plan and the adequacy of the Debtors' Disclosure Statement and setting related deadlines, (c) approving the (i) solicitation procedure and (ii) the confirmation hearing notice, (iii) waiving the requirements that (d) the U.S. Trustee convene a Meeting of Creditors and (e) the Debtors file statements of financial affairs and schedules of assets and liabilities, provided that the Plan is confirmed within sixty days of the Petition Date; (f) establishing procedures for the assumption and rejection of Executory contracts and Unexpired Leases, and (g) granting related relief.

70.     In connection with the relief requested in the Scheduling Motion, the Debtors request that the Court approve the Confirmation Schedule set forth above, subject to the Court's availability.

71.     As set forth in the Scheduling Motion, and consistent with the Bankruptcy Code and the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtors have provided full notice of the Prepackaged Plan to all known parties in interest.

72.     Beginning on October 21, 2023, the Debtors caused the proposed Claims Noticing Agent to commence e-mail service of the Solicitation Packages on all Holders of Claims in the Voting Classes.

73.     Holders of Claims in the Voting Classes were directed to follow the instructions contained in the applicable Ballot or Voting Instructions to cast a vote to accept or reject the Prepackaged Plan.  The Ballots and Voting Instructions also included instructions on how to opt out of providing the releases proposed to be given to the Released Parties as set forth in Article VIII.D of the Prepackaged Plan (the "Third Party Release").  For the avoidance of doubt, the Debtors will seek approval of the Third Party Release through confirmation of the Prepackaged Plan.

74.     The Debtors propose to (a) serve the Combined Hearing Notice, in the form attached as Exhibit 1 to the Scheduling Motion Order, within one (1) business days following entry of this Order, or as soon as reasonably practicable thereafter, on the entire creditor matrix (including shareholders of record), thus providing notice to all known third-party Holders of Claims and Interests in the Non-Voting Classes and (b) publish a form of the Combined Hearing Notice, in the form attached as Exhibit 2 to the Scheduling Motion Order (the "Publication Notice") in each of USA Today, National Edition, and the New York Times, National Edition, within seven (7) business days after entry of the Order so as to provide notice to any third party Holders of Claims and/or Interests that are unknown to, or not reasonably ascertainable by, the Debtors.

75.     The Combined Hearing Notice will (a) inform parties in interest of the commencement of these Chapter 11 Cases, (b) identify the date, time and place of the Combined Hearing, (c) set forth the Proposed Objection Deadline and the procedures for filing objections as to the adequacy of the Disclosure Statement and/or the confirmation of the Prepackaged Plan, (d) set forth the name and telephone number of a person from whom copies of the Prepackaged Plan and Disclosure Statement can be obtained at the Debtors' expense, (e) set forth the manner in which the Disclosure Statement, the Prepackaged Plan can be obtained or viewed

25

electronically, (f) provide a summary of the treatment of Claims and Interests of each Class under the Prepackaged Plan, (g) advise that a 341 Meeting will not be convened until further notice, (h) and provide notice with regard to the assumption or rejection of Executory Contracts and Unexpired Leases.

76.     I provided input on the preparation and contents of the Disclosure Statement.

77.     I have read and understand the Disclosure Statement.

78.     I have personal knowledge of the information contained in the Disclosure Statement.

79.     I believe the Disclosure Statement contains adequate information to allow creditors, potential investors, and other interested parties to permit such party to decide whether or not to vote in favor of the Prepackaged Plan.

80.     I have discussed the contents of the Disclosure Statement with the Debtors' professionals and have asked questions, and been provided answers, to solidify my understanding of the Disclosure Statement.

81.     In light of the foregoing, I believe all parties in interest have been provided a full and fair opportunity to participate in these chapter 11 cases. I believe that the relief requested in the Scheduling Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

82.     If the relief requested in the Scheduling Motion is not granted, it likely will result in significantly increased administrative costs and potential attrition among the Debtors' customers, clients, employees, and other key stakeholder groups. I further believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, will enable the Debtors to minimize any potential adverse effects to the Debtors' business as a result of the restructuring, and will position the Debtors for a prompt

emergence from bankruptcy. Given the robust noticing procedures described in the Scheduling Motion, I believe that the proposed Confirmation Schedule provides ample time for any interested party to participate in these chapter 11 cases and will preserve significant value for the Debtors' estates and their stakeholders, as more fully set forth in the Scheduling Motion. Accordingly, it is my opinion that the Scheduling Motion should be approved.

## B. Operational Motions

**1. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

83. Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (ii) continue to perform intercompany transactions consistent with historical practice and accord administrative expense status to postpetition intercompany claims arising from such transactions, and (iii) maintain existing business forms and books and records, and (b) granting related relief.

84. In the ordinary course of business, the Company operates a complex Cash Management System, a schematic of which is attached to the Cash Management Motion as <u>Exhibit A</u>. The Company uses the Cash Management System to collect, transfer, and disburse funds, and to facilitate cash monitoring, forecasting, and reporting. The Company's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions. The Company's accounting department reconciles the Company's books and records monthly to ensure that all transfers are accounted for properly.

85.     The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Company's to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities. The Company estimates that the cash receipts flowing through the Cash Management System in the twelve months prior to the Petition Date, including both Debtor and Non-Debtor Entity collections, averaged approximately $62,000,000 per month.

86.     Given the economic and operational scale and complexity of the Debtors' healthcare enterprise, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders, including the Debtors' patients.  To minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue utilizing their existing Cash Management System during the course of these chapter 11 cases. Because of the consequences that would result if the Company's Cash Management System was disrupted or restricted in any way, I believe it is critical that the existing Cash Management System remain in place.

87.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Cash Management Motion should be approved.

    **2.   Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course, and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

88.     Pursuant to the Wages Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) pay prepetition wages, salaries, and employee benefits, (ii) continue the post-

petition maintenance of any employee programs, policies and procedures in the ordinary course of business, and (b) granting related relief.  As of the Petition Date, the Debtors estimate the total amount outstanding on account of compensation and benefits is approximately $13.6 million, which is detailed in the following chart:

| Payroll Obligations | |
|---|---|
| Independent Contractors | $600,000 |
| Unpaid Compensation | $7,220,000 |
| Withholding Taxes and Obligations | $2,410,000 |
| Processing Fees | $15,000 |
| Incentive Compensation Programs | $1,900,000 |
| Out of Pocket Expenses | $10,000 |
| Director Compensation | N/A |
| **Employee Benefit Programs** | |
| Medical Plans | $608,000 |
| COBRA Plans | $225,000 |
| Dental and Vision Plans | $15,000 |
| Basic Life and AD&D Plan | $200,000 |
| HSA and FSA Programs | $57,000 |
| Workers' Compensation Program | $100,000 |
| Paid Time Off | $200,000 |
| 401(k) Plan | $92,000 |
| **TOTAL** | **$13,652,000** |

89.     The Debtors' employees are the lifeblood of their business—the continued service and morale of the Debtors' employees is essential to the Debtors' ability to provide quality patient care.  Further, the Debtors' employees are highly trained and uniquely well-versed in the industry in which the Debtors operate.  The Debtors' operations are complex and could not be continued without their employees.

90.     The Debtors seek to eliminate any personal hardship to their workforce resulting from these chapter 11 cases and to minimize the disruption to the Debtors' operations.  As of the

Petition Date, certain of the Debtors' prepetition obligations to their workforce and other related third-party service providers remain unpaid because, among other things, amounts related to prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors, and amounts deducted or withheld from Employees' (as defined below) paychecks were not then due to be paid to the intended third-party recipient or bank account, including payments on behalf of the employees in respect of the Employee Benefit Programs (as defined below) or amounts due to third parties in connection therewith, and income, garnishment, state disability, unemployment and other taxes for remittance to the appropriate federal, state, or local taxing authorities.

91.     The Debtors' Employees rely on the compensation and benefits they receive through the programs described in this Motion to pay their daily living expenses and support their families.  Granting the relief requested will enable the Debtors to maintain morale, enhance the Debtors' ability to retain and attract their valuable workforce, and otherwise eliminate any personal hardship as a result of these chapter 11 cases which, in turn, will maximize value for the benefit of all stakeholders, including the employees.

92.     ***Employee Wages***. As of the of the Petition Date, the Debtors employ and retain approximately 3,591 Employees, including approximately 893 full- or part-time Hourly Employees, and 2,698 full time Salaried Employees.  Akumin Operating Corp. employs and compensates all of the Employees.  Certain of the Debtors' Employees perform on behalf of non-Debtor affiliates, including performing services at facilities leased by such non-Debtor affiliates. Throughout the pendency of these chapter 11 cases, the Employees will continue to interface with customers and counterparties, respond to inquiries and concerns regarding the business, ongoing marketing efforts, and administration of these chapter 11 cases, and provide services.

93.     On average, the Debtors' gross monthly payroll for all Employees is approximately $19.6 million. The Employees are paid every other Friday one week in arrears, with the most recent payroll occurring on October 13, 2023, for the period of September 25, 2023 through October 8, 2023. We estimate that Employees are owed approximately $7.22 million in accrued and unpaid wages and salary as of the Petition Date. The vast majority of Employees are entitled to unpaid compensation less than $15,150 which I am advised is the cap on priority treatment for wages under the Bankruptcy Code (the "Priority Limit"). I understand that there are eleven Employees owed more than the Priority Limit, with the aggregate amount in excess of the Priority Limit of $85,000. The Debtors request authority to pay the unpaid compensation, including amounts above the Priority Limit, and wages and salary that accrues postpetition in the ordinary course.

94.     ***Independent Contractor Payments***.   The Debtors supplement their workforce with various Independent Contractors.   These Independent Contractors are necessary for the ongoing operation of the Debtors' business. Among other positions, the Independent Contractors perform various roles including, but not limited to, clinical support, oncology physicists, information technology (IT) support, and network engineering services.   The Debtors retain approximately sixty Independent Contractors, all of whom play a critical role in the Debtors' day-to-day operations and, thus, to the preservation of value of the Debtors' estates.   Certain of the Independent Contractors are utilized on a recurring basis, while others are utilized only as needed.   The Debtors maintain similar employment structures for Employees and Independent Contractors; thus, like the Employees, certain of the Debtors' Independent Contractors perform services on behalf of non-Debtor affiliates, including performing services at facilities leased by such non-Debtor affiliates. On average, the Debtors pay the Independent Contractors approximately $415,000 per month.   As of the Petition Date, the Debtors estimate that

approximately $600,000 remains due and owing to the Independent Contractors, all of which is due and payable within the first thirty (30) days after the Petition Date. The Debtors seek authority to honor their obligations to their Independent Contractors by paying in the ordinary course any unpaid amounts owed as of the Petition Date.

95.    ***Incentive Programs***. In the ordinary course of business, the Debtors maintain more than thirty programs to motivate, reward, and retain certain of their non-insider Employees. These Incentive Compensation Programs are essential to the Debtors' ability to both recruit and retain valuable and talented employees by incentivizing Employees to perform at high levels and achieve certain sales and other metrics. The bulk of these programs are non-discretionary and require compensation of covered Employees if and when they achieve the relevant metrics. Employees rely on and anticipate compensation pursuant to these Incentive Compensation Programs.

96.    The Incentive Compensation Programs, excluding management incentive plan,[8] are divided by (a) retention, referral, and sign on bonuses, (b) compensation for both medical and non-medical employees upon achieving certain metrics, including financial and collection targets, monthly utilization targets, and other division-specific targets, and (c) sales and revenue specific payments for various divisions of the Debtors' business.  Payments pursuant to the Incentive Compensation Programs are made on a monthly, quarterly, and annual basis, depending on the plan, and may become payable during pendency of these chapter 11 cases, including payments that accrued prior to the Petition Date.  On average, the Debtors spend $830,000 per month and $10.0 million per year on account of the Incentive Compensation Programs.

97.     As of the Petition Date, the Debtors estimate that they owe, in the aggregate, approximately $1.9 million on account of the Incentive Compensation Programs,[9] which amount does not include any payments under the management incentive plans. A majority of the Employees participating in the Incentive Compensation Programs are owed (or are projected to be owed) less than the Priority Limit (taking into account unpaid wages and salary). However, there are fourteen Employees who are entitled to (or are projected to be entitled to) payments pursuant to the Incentive Compensation Programs in excess of the Priority Limit (when taking their unpaid wages and salary into account). The aggregate total of outstanding and projected payments under the Incentive Compensation Programs in excess of the Priority Limit is approximately $310,000.

98.     **_Business Expenses_**.  Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment, including travel, lodging, ground transportation, meals, automobile usage (gas or mileage), subscription charges and other miscellaneous business expenses. We estimate that approximately $10,000 remains due and owing on account of these business expenses as of the Petition Date. By the Wages Motion, the Debtors request authority to reimburse business expenses.

99.     **_Director Compensation_**.  As of the Petition Date, the Debtors maintain a board of directors, comprised of ten (10) directors, nine (9) of whom are non-Employees (collectively, the "Directors").  The Directors are paid cash compensation on a quarterly basis, receive certain

---

[8]     The Debtors do maintain a Management Incentive Plan which covers various leaders in the company, and may include insiders. The Debtors are not requesting authority to make any payments under this plan as payments under this plan are made annually in March.

[9]     Note that while the amount of payments under certain Incentive Compensation Programs are known as of the Petition Date, the amounts of payments under other Incentive Compensation Programs can only be estimated based on historical payments under such plans.

restricted stock units annually, and are entitled to expense reimbursement for all reasonable and documented out-of-pocket business expenses incurred in connection with their duties as members of the Board (the "<u>Director Compensation</u>").

100.    The Debtors believe there are no outstanding amounts with respect to the Director Compensation as of the Petition Date. The Debtors request the authority to honor any prepetition obligations on account of Director Compensation and to continue paying such Director Compensation on a postpetition basis in the ordinary course of business and consistent with historical practice.

101.    ***Employee Benefit Programs***.  In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including, but not limited to, medical plans, dental plans, vision plans, life insurance plans, short-term and long-term disability plans, other paid time off, and a 401(k) plan (collectively, the "<u>Employee Benefit Programs</u>").  The Employee Benefit Programs are, in each case, available to all Employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any Employee Benefit Program.

102.    The Debtors seek authority, in their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs in the ordinary course of business and consistent with prior practice relating to the Employee Benefit Programs,[10] subject to the Debtors' ability to modify or discontinue any Employee Benefit Programs in their discretion and to reduce applicable costs, the scope of benefits provided, or reporting periods permitted thereunder.  As of the Petition Date, the Debtors believe they owe $1.5 million on account of Employee Benefit Programs.

---

[10] Relief requested in this Motion shall not constitute or be deemed an assumption or an authorization to assume any of such Employee Benefit Programs under section 365(a) of the Bankruptcy Code.

103.   **Workers' Compensation**.   The Debtors maintain a workers' compensation programs and workers' compensation insurance at the levels required by law in the states in which the Debtors have Employees and, where applicable, make payments on account of workers' compensation claims. As of the Petition Date, the Debtors estimate that they owe approximately $100,000 under the workers' compensation programs. The Debtors request authority to maintain these programs and to permit Employees to continue prosecution of their workers' compensation claims notwithstanding the bankruptcy filing.

104.   **Paid Time Off**. All Employees are eligible for paid time off ("PTO"), which can be used for vacation, personal appointments, family matters, sick days, school activities, religious observances, rest and relaxation, and other personal obligations (the "PTO Policy"). Employees are permitted to rollover unused PTO up to certain limits. A portion of unused PTO is paid out to Employees depending on their role, the nature of their separation from the companies, and their tenure as Employees, unless applicable state law requires payment of the full amount of unused PTO.

105.   As of the Petition Date, there are approximately 191,000 hours of accrued and unused PTO, valued at approximately $6.75 million. The Debtors estimate that they will be obligated to pay out approximately $200,000 in unused PTO during pendency of these chapter 11 case. The Debtors seek authorization to continue the PTO Policy in the ordinary course of business, including making pay outs of unused PTO to departing Employees.

106.   Employees and Independent Contractors are critical to the ordinary course operations of the Debtors. Indeed, the Debtors are in the service industry and need their Employees and Independent Contractors to provide those services.  The Debtors believe that absent the payment of the compensation and benefits owed to the Employees and Independent Contractors the Debtors may experience workforce turnover and instability at this critical time in

these chapter 11 cases.  Without these payments, the workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees and Independent Contractors may face.  Such individuals may then elect to seek alternative employment opportunities.  A significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtors therefore believe that payment of the prepetition obligations with respect to the compensation and benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

107.    I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Wages Motion should be approved.

### 3. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Refund Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").

108.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a) authorizing the Debtors to maintain and administer their existing refund programs and honor certain prepetition obligations related thereto and (b) granting related relief.

109.    Various contractual obligations, as well as various state and federal laws and administrative rules, require in certain instances that the Company refund patients and other third parties, including healthcare facilities, healthcare insurers, and federal health care programs such

as Medicare and Medicaid.  The Company may owe refunds to Refund Recipients as a result of overpayment by such parties, as well as pursuant to the terms of the Company's contracts with healthcare facilities and insurance companies.  In the ordinary course of business, the Company routinely issues refunds or, in lieu of issuing refunds, offset amounts ultimately owed to Refund Recipients resulting from the interaction between the Company's contractual obligations, billing procedures, patient medical insurance deductibles, and third-party payments.

110.   ***Patient Refunds***.  In the ordinary course of business, the Company bill patients and insurers for medical services provided to patients.  After a patient pays the Company for medical services, a "credit balance" may occur when the total payments and/or adjustments exceed the gross charges on a patient account.  Once this credit balance has been identified and validated by the Company, the patient is entitled to a credit or refund from the Company.

111.   Patient refunds can result in several situations, including: (a) duplicate payments being processed, (b) a patient pays an initial out-of-pocket estimate for services, but after the insurance portion of the payment is made, the out-of-pocket amount due from the patient is less than estimated, (c) a patient is billed an inaccurate amount, or (d) there is a change of insurance coverage for the applicable patient (for instance, the Company may have been unaware of secondary insurance coverage and the amount due from the patient is adjusted once the secondary insurance coverage is applied to the services).

112.   ***Insurance Refunds***.  In the ordinary course of business, the Company is often paid by healthcare insurers, including Medicare and Medicaid for services provided to patients.  Based upon the Company's contracts with private insurers, and pursuant to the Regulations, if a healthcare insurer overpays for services rendered to patients, the Company is obligated to refund the overpaying party for the excess amounts paid to the Company (such refunds, the "Insurance Refunds" and, together with the Patient Refunds and Healthcare Facility Refunds, the

"Refunds").  Overpayments resulting in Insurance Refunds have a variety of causes, including: (a) duplicate payments made for the same service, (b) overpayment by an insurer or coinsurer, (c) instances in which a claim must be voided due to error after an insurer has already paid, (d) payments made by an insurer for services rendered after termination of coverage, (e) payments made by a secondary insurer after the primary insurer has already paid for the services, and (f) payments received by multiple insurers. The Company estimates that it owes $120,000 in combined prepetition Patient Refunds and Insurance Refunds as of the Petition Date.

113.    ***Healthcare Facility Refunds***.  In the ordinary course of business, the Company provides services to the certain Healthcare Facilities pursuant to the Healthcare Facility Agreements Pursuant to the Healthcare Facility Agreements, the Company bills the Healthcare Facilities directly for amounts owed on account of services provided by the Company.

114.    Occasionally the amount that the Healthcare Facilities pay the Company exceeds the amount actually owed for the services provided.  Once such overpayments are identified, the Company issues refunds for the excess payment amount to the Healthcare Facility that overpaid pursuant to the Healthcare Facility Agreements.  Healthcare Facility overpayments are infrequent and typically result from billing errors, with approximately 3-4 such overpayments occurring each month, resulting in approximately $10,000 - $15,000 of monthly refunds. The Debtors estimate that they owe $18,000 in prepetition Healthcare Facilities Refunds as of the Petition Date.

115.    ***Health System Rebates***. In the ordinary course of business, the Company provides services to the following partner health systems: (1) Premier Healthcare Alliance, LP; (2) Healthtrust PG-HPG; and (3) Common Spirit Health (each a "Health System" and collectively, the "Health Systems").  To retain the Health Systems' business, when the Health

Systems reach certain volume and other target revenue-based metrics, the Company provides a negotiated percentage rebate (the "Health System Rebates") to the Health Systems.

116.    The Company provides rebates of: (i) 2% of revenue billed to Premier Healthcare Alliance, LP on a monthly basis; (ii) 1 to 3% of revenue billed to Healthtrust PG-HP on a monthly basis; and (iii) 4% of revenue billed to Common Spirit Health on a quarterly basis.  The Company estimates that they owe the Health Systems $370,000 of accrued prepetition rebates as of the Petition Date.

117.    The Debtors seek authority to continue the Refund Programs in the ordinary course consistent with past practice and to honor certain prepetition obligations under such Refund Programs.  The failure to do so could materially harm the trust and confidence of the Company's patients and other Refund Recipients during these chapter 11 cases.  The Company's patients, physicians, and Healthcare Facility partners are pivotal to the success of the Debtors' enterprise, and any loss of goodwill among them or termination of insurer agreements or Healthcare Facility Agreements could cause significant harm to the Debtors' business to the detriment of all stakeholders and could lead to potential legal challenges.  The Debtors would suffer reputational damage with service providers and a reduction in the value of their assets and business enterprises should the Company fail to reimburse Refund Recipients for overpayments relating to medical services.

118.    The Debtors estimate that the prepetition amount of outstanding Refunds is $505,000. At any given time, however, it is difficult to determine the total amount of outstanding overpayments that have been identified, but for which a refund check has not yet been issued or offsetting has not yet occurred.  There is typically a significant lag between when a patient is treated, when the credit balance is identified, quantified, and validated, and when the Refund is ultimately issued to the appropriate Refund Recipient.  Moreover, some refund checks issued to

Refund Recipients before the Petition Date may not have been presented for payment or may not

have cleared the Company's banking system or accounting system and, accordingly, have not

been honored and paid as of the Petition Date.  Nonetheless, the Company is required, under

contract and various laws, to reimburse Refund Recipients as overpayments are identified.  The

Debtors seek to honor all prepetition obligations related to the Refund Programs and to continue

to do so, as necessary, on a postpetition basis in the ordinary course of business.

119.    I believe that the relief requested in the Customer Programs Motion is in the best

interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it

is my opinion that the Customer Programs Motion should be approved.

> **4. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Claims Administration Fees, (D) Maintain the Surety Bond Program and Letters of Credit, and (E) Honor and Renew the Premium Financing Agreements Entered Into Prepetition and Satisfy Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

120.    Pursuant to the Insurance Motion, the Debtors seek entry of an order (a)

authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy

prepetition obligations related thereto, (ii) renew, amend, supplement, extend, or purchase

insurance policies, (iii) continue to pay brokerage fees, (iv) maintain surety bond program and

letters of credit, and (iv) honor and renew the premium financing agreement entered into

prepetition and satisfy obligations related thereto, and (b) granting related relief.

121.    In the ordinary course of business, the Debtors maintain forty-seven insurance

policies (collectively, the "<u>Insurance Policies</u>") with thirty-six insurance carriers (collectively,

the "<u>Insurance Carriers</u>").  The Insurance Policies provide coverage for, among other things,

losses related to the Debtors' real and personal property, medical malpractice, professional, and general liability, commercial crime liability, management liability, terrorism and political violence liability, inland marine liability, cyber liability, directors' and officers' liability, fiduciary liability, errors and omissions liability, automobile liability, workers' compensation, and employer and employment practices liability.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.  A schedule of the Insurance Policies is attached to the Order as Exhibit 1 (the "Insurance Schedule"), which is incorporated herein by reference.

122.    The ability to maintain the Insurance Policies, to extend or reduce those Insurance Policies, and to enter into new insurance policies as needed in the ordinary course of business, is essential to the preservation of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance agreements.  In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the U.S. Trustee. It is particularly important to maintain comprehensive insurance in the current economic environment as the healthcare industry continues to adjust to the impacts of the regulatory changes that have reduced reimbursement rates, such as the No Surprises Act and Medicare Fee Schedule Changes.  The Debtors seek authority to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related thereto upon entry of the Order, renew, amend, supplement, extend, or purchase new Insurance Policies, and maintain the Surety Bond Program on a postpetition basis in the ordinary course of business consistent with past practice.

123.    Twenty-six of the Insurance Policies are or were funded through three premium financing agreements between the Debtors and First Insurance Funding. Pursuant to the Premium

Financing Agreements, the Debtors pay the financing premiums on a monthly basis for the insurance coverage provided for the Debtors and certain non-Debtor entities under the Premium Financing Agreements.

124.     The aggregate annual premium for the Insurance Policies financed under the Premium Financing Agreements is approximately $11.5 million plus applicable taxes and surcharges.   In addition to the premiums paid under the Premium Financing Agreements, the Debtors paid an aggregate amount of approximately $830,349 in non-financed Premiums in 2023, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.   The Debtors pay the non-financed Premiums on various schedules—monthly, annually or otherwise—over the course of the policy period.   Typically, the Insurance Policies at issue are renewed annually at various times throughout the year.

125.     Continuing to perform under the Premium Financing Agreements on a post-petition basis is in the best interests of the Debtors' estates.   In light of their financial circumstances, alternative insurance premium finance companies may not be willing to provide insurance premium financing to the Debtors on attractive market terms on a postpetition basis. As a result, it is critical for the Debtors to continue to make disbursements on account of the premiums due under the Premium Financing Agreement and otherwise perform under their existing Premium Financing Agreement.

126.     As of the Petition Date, the Debtors believe that they owe $6.0 million on account of the Premium Financing Agreements and have no outstanding amounts on account of non-financed Premiums for the Insurance Policies.   The Debtors seek authority to pay any direct or indirect prepetition amounts due and owing in connection with the Premium Financing Agreements and non-financed Insurance Policies.   The Debtors further seek authority to enter into new premium financing agreements, directly with the finance providers, and continue

paying amounts owed in connection with the Premium Financing Agreements and Insurance Policies, as they come due in the ordinary course of business on a postpetition basis and consistent with past practice without further Court approval.

127.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Insurance Motion should be approved.

5.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

128.    Pursuant to the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay Taxes and Fees, without regard to whether such obligations accrued prior to the Petition Date, that will become payable during the pendency of these chapter 11 cases, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date, and (b) granting related relief.

129.    The Debtors estimate that approximately $4,021,000 in Taxes and Fees is outstanding as of the Petition Date.

130.    In the ordinary course of business the Debtors collect, withhold, and incur, sales taxes, use taxes, commercial taxes, business and occupation taxes, income taxes, franchise taxes, and property taxes, as well as taxes interest, penalties, fees, and assessments.  The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities on a monthly, quarterly, semi-annual, or annual basis depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.   A schedule identifying the Taxing Authorities is attached as <u>Exhibit 1</u> to the Tax Motion Order (the "<u>Tax Schedule</u>").  The Debtors estimate that the prepetition amount owing to the Taxing Authorities (as defined below) in the

aggregate is approximately $4,021,000. The Debtors generally, but not exclusively, pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers. From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes or Fees. The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or have the amount of such credits refunded to the Debtors.

131.    The Debtors seek authority to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees, including: (a) where Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) where payments made prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities; and (d) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of these chapter 11 cases, including as a result of Audits. In addition, the Debtors seek authority to pay Taxes and Fees for so-called "straddle" periods.

132.    Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in some instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' chapter 11 cases. Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both. In addition, nonpayment of the Taxes and Fees may give rise to priority claims under

section 507(a)(8) of the Bankruptcy Code.  The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, the Debtors seek authority to pay the Taxes and Fees and Assessments as they become due.

133.    I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Taxes Motion should be approved.

> **6. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures For Resolving Objections By Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").**

134.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) approving the Debtors' proposed procedures for resolving objections by Utility Companies, (c) prohibiting Utility Companies from altering, refusing, or discontinuing service to the Debtors, and (d) granting related relief.

135.    In connection with the operation of their business and management of their properties in the ordinary course of business, the Debtors and certain Non-Debtor Entities obtain telecommunications, internet, information technology, water, gas, electricity, waste management, and other utility services from a number of Utility Companies.  A nonexclusive list of the Utility Companies that provide Utility Services to the Debtors and Non-Debtor Entities as of the Petition Date is annexed to the Utility Motion as Exhibit A.

136.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of the Debtors' reorganization.  The Debtors and the Non-Debtor Entities utilize Utility Services at both their patient-focused facilities as well as their corporate and field offices.  As noted, the Debtors' business involves providing healthcare to their patients. On any given business day, patients undergo procedures and receive medical treatments for which sophisticated equipment powered by the Utility Companies is essential.  While any interruption in Utility Services would be very detrimental to the Debtors' business, such interruptions, no matter how brief, could be extremely harmful to the patients at the Debtors' facilities.  Without Utility Services, the Debtors' operations would shut down and patients could be harmed.  The Debtors also maintain corporate headquarters in Florida, a corporate office in California, and numerous field offices primarily responsible for managing the day-to-day operations of the Debtors.  These locations also require electricity, water, gas, telecommunications, internet, and waste management services, and it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

137.    Historically, the Debtors have a good payment record with the Utility Companies. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services.  In the past, the Debtors paid approximately $1.2 million for Utility Services, calculated on their monthly average for the 12-month period prior to the Petition Date.  The Debtors estimate that the prepetition amount owing to the Utility Providers in the aggregate as of the Petition Date is approximately $2.0 million, of which $2.0 million is expected to be due and payable within thirty (30) days after the Petition Date.

138.    The Debtors intend to pay both prepetition and postpetition obligations owed to the Utility Companies in a timely manner and anticipate having sufficient funds to do so.  Cash

on hand and cash generated in the ordinary course of business as well as anticipated access to available cash collateral will provide the Debtors with sufficient liquidity to pay the Utility Companies for Utility Services in accordance with past practice.

139.    To provide the Utility Companies with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to two weeks cost of Utility Services, calculated using the historical average for such payments during the 12 months prior to the Petition Date, into a segregated account for the benefit of the Utility Companies at one of the banks and/or financial institutions at which the Debtors maintain their accounts.  As of the Petition Date, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $605,825.

140.    Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  The Adequate Assurance Procedures set forth a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.  More specifically, the Adequate Assurance Procedures permit a Utility Company to object to the Proposed Adequate Assurance by serving an Additional Assurance Request upon certain notice parties.

141.    The Debtors, in their discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Company and without further order of the Bankruptcy Court.  If the Debtors and the Utility Company are not able to reach a resolution within thirty (30) days of receipt of the Additional Assurance Request, the Debtors will request a hearing to determine the adequacy of assurances of payment with respect to a particular Utility Company.  Unless and until a Utility Company files an objection or serves an Additional Assurance Request, such Utility Provider shall be (a) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with section 366 of

the Bankruptcy Code and (b) forbidden to discontinue, alter, or refuse services to, or discriminate against, the Debtors on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.  Absent compliance with the Adequate Assurance Procedures, the Debtors request that the Utility Companies, including those subsequently added to the Utility Services List, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.

142.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, it is my opinion that the Utilities Motion should be approved.

**7. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief (the "<u>Equity Trading Motion</u>").**

143.    Pursuant to the Equity Trading Motion, the Debtors seek entry of an order (a) approving notification and hearing procedures related to certain transfers of Debtor Akumin Inc.'s existing common stock or any Beneficial Ownership therein, as detailed in <u>Exhibit 1</u> to the Equity Trading Motion Order, (b) directing that any purchase, sale, or other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief.

144.    The Debtors estimate that, as of December 31, 2022, they had approximately $911 million of federal and state NOLs and significant asset basis (together with certain other tax attributes, collectively, the "<u>Tax Attributes</u>").  Importantly, like their NOLs and other tax attributes, the Debtors' asset basis is a valuable attribute that may be limited by the application of Section 382 of the Internal Revenue Code.  The Debtors believe that they have a "net unrealized

built-in loss" because they estimate that the aggregate adjusted basis of all of their assets is greater than their fair market value, and estimate that they may generate additional Tax Attributes in the 2023 tax year.

145.     The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or directly offset federal tax liability in future years.  Such Tax Attributes may also be utilized by the Debtors to offset any taxable income or federal tax liability generated by transactions consummated pursuant to the Plan.  Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

146.     I believe that the relief requested in the Equity Trading Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Equity Trading Motion should be approved.

**8. Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Pay All Accounts Payable Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Satisfaction of Obligations Related Thereto, and (IV) Granting Related Relief (the "<u>Trade Motion</u>").**

147.     Pursuant to the Trade Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay all Accounts Payable claims to Trade Creditors in the ordinary course of business; (b) granting administrative expense priority to all undisputed obligations on account of goods or services ordered by the Debtors prior to the Petition Date that will not be delivered or provided until after the Petition Date, and (c) authorizing the Debtors to satisfy obligations on account of Outstanding Orders in the ordinary course of business; and (d) granting related relief.

148.    As of the Petition Date, the Debtors estimate that the prepetition amount owing to the Trade Creditors in the aggregate is approximately $76 million.    Of such amount, approximately $32.2 million is due and payable within thirty (30) days after the Petition Date.

149.    The Trade Creditors are a critical component of the Debtors' ability to manage safe medical facilities and provide high-quality care to patients.  The Debtors' cancer treatment centers require a steady supply of goods and services from Trade Creditors to provide essential healthcare services and to maintain safe medical facilities.  Any disruption in the provision of these critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business and could jeopardize the well-being of the Debtors' patients.

150.    ***The Accounts Payable Claims***. The Trade Creditors provide the Debtors with goods and services in the ordinary course of business, including, among other things: pharmaceutical services, radiation oncology services and equipment, radiology equipment and services, repairs of medical equipment; and a variety of other basic business necessities for the operation of the Debtors' businesses.  While the Debtors have a variety of arrangements with the Trade Creditors, a majority of the Trade Creditors provide the Debtors with payment terms that include due upon receipt, 30 days or 60 days.  The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  These payment obligations averaged approximately $34.75 million per month, in the aggregate, for the twelve months preceding the Petition Date, and, as of the Petition Date, the Debtors estimate that there are approximately $76 million of accrued and unpaid Accounts Payable Claims, of which approximately $16.1 million comprise statutory lien claims, and approximately $59.9 million comprise General Unsecured Claims that are not lien claims.  The Debtors estimate that approximately $32.2 million of the accrued and unpaid Account Payable Claims will come due

within 30 days of the petition date, of which $28.4 million comprise General Unsecured Claims that are not lien claims.

151.    The goods and services giving rise to the Accounts Payable Claims are necessary to the Debtors' business operations.  A significant portion of the Accounts Payable Claims are related to materials necessary for radiology and oncology services.  The failure to pay these Accounts Payable Claims in a timely manner could result in material disruptions in the Debtors' business operations, which could have a negative impact on the Debtors' reputation with their customers and cause irreparable harm to the Debtors' businesses.  Additionally, certain Accounts Payable Claims are held by Trade Creditors that may be able to assert liens on account of any unpaid obligations, such as equipment lease liens, carrier liens, warehouseman's liens, and mechanics' liens.  The failure to pay the Accounts Payable Claims of such Trade Creditors in a timely manner could unnecessarily disrupt the Debtors' business operations.

152.    *The Outstanding Orders*.  Prior to the Petition Date, and in the ordinary course of business, the Debtors placed the Outstanding Orders.  In the mistaken belief that they would be prepetition general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may seek to recall shipments then in transit) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  As set forth in greater detail below, because the Outstanding Orders are administrative expenses of the Debtors' estates, the Debtors are requesting that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business.

153.   ***Payments on behalf of Non-Debtor Entities.***   The Debtors engage in various intercompany transfers with Physician Entities and Non-Debtor JV Entities.   Pursuant to the Debtors' agreements with such Non-Debtor Entities, the Debtors are obligated to pay certain of the Non-Debtor Entities' operating expenses in the ordinary course of business.   For certain of the Non-Debtor Entities, the Debtors pay all operating expenses either directly or indirectly, including staff wages, taxes, utilities, and equipment.   In exchange, the Debtors receive compensation in the form of a management fee and reimbursement for payments made to or on behalf of the Non-Debtor Entities.   The operation of the Non-Debtor Entities is critical to the Debtors' reorganization and benefits the Debtors' estates.

154.   I believe that the relief requested in the Trade Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, it is my opinion that the Trade Motion should be approved.

**B.**     **Statement of Support for First Day Motions**

155.   Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtors achieving a successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders.   I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm.   Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 22, 2023                    */s/ Riadh Zine*
                                            Riadh Zine
                                            Chairman, Chief Executive Officer and
                                            Director